IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-01313-PSF-CBS

CAROL K. AUSTIN,

      Plaintiff,

v.

CITY AND COUNTY OF DENVER, a body politic and
corporate of the State of Colorado, acting by and through
its BOARD OF WATER COMMISSIONERS and
CHRISTOPHER R. DERMODY, in his official capacity,

      Defendants.

## ORDER ON PENDING MOTIONS

Magistrate Judge Craig B. Shaffer

      THIS MATTER comes before the court on Defendants' Motion to Quash Subpoena Duces Tecum (Document # 42), filed on March 17, 2006. This motion seeks to quash a subpoena *duces tecum* served by Plaintiff Austin on a non-party witness, Dr. Carolyna Smiley-Marquez.

      Also pending before the court is Plaintiff Austin's Motion to Compel Production of Documents (Document # 50), filed on March 22, 2006. This motion requests a Order compelling Defendants to produce unredacted documents previously in the possession of Dr. Smiley-Marquez. Plaintiff Austin maintains that these unredacted documents should be produced in response to Plaintiff's First Set of Requests for Production of Documents, served on December 20, 2006.

      On July 19, 2005, this matter was referred to the Magistrate Judge to, *inter alia*, "hear

1

and determine pretrial maters, including discovery and other non-dispositive matters." The court has carefully considered the parties' arguments and exhibits, the material submitted for *in camera* review, the applicable case law and the entire court files, and is sufficiently advised in the premises. For the following reasons, Plaintiff Austin's Motion to Compel is granted, and Defendants' Motion to Quash is denied.

## FACTUAL BACKGROUND

Plaintiff Austin initiated the instant litigation on July 14, 2005, by filing a Complaint that asserts claims for age and gender discrimination, breach of contract, violation of the Fair Labor Standards Act, and constitutional violations under 42 U.S.C. § 1883. Ms. Austin began her employment in the Information Technology Department of the Denver Water Board on May 22, 1990. She was terminated on July 12, 2005. Plaintiff contends that over an extended period of time, she was subjected to continuing age and sex discrimination, and forced to endure less than favorable working conditions. During the course of her employment, Ms. Austin filed a number of internal complaints and grievances against the Denver Water Board, commencing on or about January 30, 2003. Plaintiff alleges that "as a general pattern . . . Denver Water Board and [her supervisor], shortly after receiving such complaints and grievances, retaliated against Plaintiff and took adverse employment actions against her." *See* Complaint, at ¶ 9.

Not surprisingly, Defendants describe a very different situation. According to Defendants, Plaintiff Austin "was fired for insubordination and unsatisfactory performance of job duties." Denver Water characterizes Ms. Austin as "difficult to manage" and "incapable of performing the tasks assigned to her without remedial training and assistance." *See* Scheduling Order (Document #11), at 5 and 6.   More particularly, Denver Water insists that it "exercised reasonable care

2

to prevent and promptly correct any unlawful behavior of its employees of which it was made aware." *Id.*

The facts underlying the instant motions are not substantially in dispute. During the period from June 16 through September 10, 2003, five Denver Water employees, including Ms. Austin, filed internal complaints alleging violations of internal policies regarding equal employment opportunity and non-discrimination. Denver Water's written policies provide that

> if the complaint is not resolved, Human Resources will conduct an investigation and make preliminary findings. Before issuing the preliminary findings to those directly affected, Human Resources will consult with the Division Director(s) of the affected employees and the Legal Division.

*See* Defendants' Motion to Quash, at 2. Denver Water's Manager of Human Resources, Carla Elam-Floyd, has described how this policy would be implemented in the usual case:

> The investigation would occur, gathering documents, interviewing people, speaking with our – our internal attorneys, and putting together a – a report that, after they had cleared it with legal, they would present to me, I would review it, see if there were any questions that I felt hadn't been answered, and it would either approve – approve or, you know, disapprove or ask them to go back and get more information to complete the report.

*See* Deposition of Carla Elam-Floyd, at 19-20, attached as Exhibit 1 to Defendants' Reply to Plaintiff's Response to Defendants' Motion to Quash. The purpose of the investigation is to "determine if there is any truth to the allegations that have been made by the complainants." *Id.* at 24. If the allegations are substantiated, the investigation will suggest corrective action. *Id.*

In the wake of the five roughly contemporaneous complaints filed by Denver Water employees, the Human Resources Department departed from its usual investigation protocol. Ms. Elam-Floyd concluded that this more expansive investigation

> would be better handled by someone from the outside than by our staff. We didn't

3

> really have the – the resources to complete that type of an investigation in a timely fashion. We wanted someone who had that experience.

*Id.* at 21. The decision to hire Dr. Smiley-Marquez was based upon her experience and background.[1] Dr. Smiley-Marquez was assured that she would receive the full cooperation of Human Resources personnel, access to records, and private accommodations in which to conduct interviews and review documents. According to Ms. Elam-Floyd

> We didn't necessarily establish guidelines with her because we wanted her to follow – to do what she does. That's why we wanted it to be independent, so we didn't tell her how to do it. We just told her what we needed to have done, what the complaints were that had come in, and those needed to be investigated.

*Id.* at 22. Dr. Smiley-Marquez apparently prepared a separate investigative report regarding each complainant, which included factual and non-factual findings, as well as the consultant's legal analysis and conclusions. Dr. Smiley-Marquez also prepare a report, dated November 15, 2003, entitled "Implications of Five Discrimination Investigation Findings for the Information Technology Section, Denver Water Department" (hereinafter "Implications Report").

After receiving Dr. Smiley-Marquez's preliminary written findings, the Manager of Human Resources was responsible for issuing a final report. Before that taking step, however, Ms. Elam-Floyd "needed to present that information to our legal department and given them time to go through and ask their questions and – and – and, also, do any follow-up that I felt I needed to do before the final report was issued." *Id.* at 27. While the Legal Department was not in contact with Dr. Smiley-Marquez during her investigation, in-house counsel "was aware of what was

---

[1] Dr. Smiley-Marquez claims over 22 years of experience in the field of equal opportunity, and provides consultation and training on equal employment opportunity compliance and on complaint processing to both public and private employers. According to Dr. Smiley-Marquez, she has been certified by the federal government as an EEO counselor, and as served as an expert witness in discrimination and compliance cases.

going on, and they were advising [Human Resources] along the way at the beginning of this and throughout." *Id.* at 28.

On December 13, 2003, the Manager of Human Resources wrote to Ms. Austin and the other complainants. Ms. Elam-Floyd advised the employees that Dr. Smiley-Marquez's preliminary reports were being reviewed by the Legal Department and that she expected to "issue a final report based on Dr. Smiley-Marquez's preliminary findings."

Prior to issuing her final report, Ms. Elam-Floyd conducted interviews herself, reviewed records relating to any corrective action taken involving the complaining employees, and evaluated the information included in Dr. Smiley-Marquez's reports. *Id.* at 33. Based upon that review, Ms. Elam-Floyd did not uniformly adopt Dr. Smiley-Marquez's finding with respect to Ms. Austin's allegations. The Manager of Human Resources found no "hard evidence of retaliation" and concluded that there was no evidence that any Denver Water employee had violated Title VII. *See* Deposition of Carla Elam-Floyd, at 140, attached to Plaintiff's Reply to Defendants' Response to Plaintiff's Motion to Compel.

On December 23, 2005, Plaintiff Austin served her First Set of Request for Production of Documents, which sought, *inter alia*,

> copies of any and all documents related to, reviewed or prepared in connection
> with any and all investigations of workplace disputes in the DWD IT Department
> from 2000 through 2005. This includes any and all documents reviewed or
> prepared by C. Smiley-Marquez, Ph.D.

On or about February 7, 2006, Denver Water responded to Plaintiff's First Set of Request for Production. After making certain objections that are not germane to the instant motions, Defendants stated they would produce documents reviewed or prepared by D. Smiley-Marquez

5

related to Plaintiff's worked-related disputes, to the extent those documents "are not protected by any privilege or promise of confidentiality recognized by law." Denver Water also agreed to produce "investigation reports prepared by C. Smiley-Marquez, Ph.D. regarding internal work-related complaints filed by four employees in Denver Water's IT section in 2003, with information protected by attorney-client redacted." *See* Exhibit 1, attached to Plaintiff's Motion to Compel. Defendants have represented to the court that they have produced to Ms. Austin all materials reviewed or created by Dr. Smiley-Marquez to the extent those documents contain factual information. Defendants have redacted those portions which set forth the consultant's personal opinions and analyses regarding the complainants' potential legal claims.

On or about March 6, 2006, Plaintiff served a subpoena *duces tecum* on Dr. Smiley-Marquez commanding production of "all files, including personal notes taken in regard to the investigation of five complaints of individuals from the Information Technology Section of the Denver Water Board, which complaints were filed between June 16, 2003 and September 10, 2003." As a practical matter, Plaintiff seeks access to the redacted portions of Dr. Smiley-Marquez's materials and reports. This action prompted Defendants to file their Motion to Quash Subpoena Duces Tecum (Document # 42). Not to be outdone, Plaintiff filed her Motion to Compel Production of Documents (Document # 50), on March 22, 2006. These motions raise identical issues and turn on the same underlying facts.

On April 25, 2006, this court held a hearing on the pending motions. After hearing argument from counsel, Denver Water was directed to provide an unredacted copy of Dr. Smiley-Marquez's Implication Report for the court's *in camera* review.

**ANALYSIS**

By excluding "privileged" information from the broad parameters of pre-trial discovery, Fed.R.Civ.P. 26(b)(1) attempts to strike a balance between conflicting interests. Privileges further the administration of justice and "should not be set aside lightly." *See Horton v. United States*, 204 F.R.D. 670, 672 (D. Colo. 2002); *McNeil-PPC, Inc. v. Procter & Gamble Co.*, 138 F.R.D. 136, 138 (D. Colo. 1991). However, privileges also have the effect of withholding relevant information from the finder of fact, and for that reason should be narrowly construed. *See Montgomery v. Leftwich, Moore & Douglas*, 161 F.R.D. 224, 225 (D.D.C. 1995). *See also Export-Import Bank of the United States v. Asia Pulp & Paper Co., Ltd.*, 232 F.R.D. 103, 114 (S.D.N.Y. 2005) ("the attorney-client privilege should not be expanded without considerable caution because the privilege 'stands in derogation of the public's right to every man's evidence'"). The party withholding information on the basis of privilege must make a clear showing that the asserted privilege applies and must establish all elements of the privilege. *National Union Fire Ins. Co. of Pittsburgh v. Midland Bancor, Inc.*, 159 F.R.D. 562, 567 (D. Kan. 1994). *See also* Fed.R.Civ.P. 26(b)(5) (the party claiming privilege must present sufficient information to permit the opposing party to assess the applicability of the privilege). The factual findings underlying a trial court's attorney-client privilege ruling are reviewed for clear error, while purely legal questions are reviewed *de novo*. *In re Grand Jury Subpoenas*, 144 F.3d 653, 658 (10th Cir. 1998).

The attorney-client privilege protects from discovery communications between a client and an attorney, made in order to obtain or deliver legal assistance, that the participants intended to

treat as confidential.[2]  *See Aull v. Cavalcade Pension Plan*, 185 F.R.D. 618, 624 (D. Colo. 1998).

> "The [attorney-client] privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer being fully informed by the client . . . 'The lawyer-client privilege rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out.'"

*Horton v. United States*, 204 F.R.D. at 672 (quoting *In re Bieter Co.*, 16 F.3d 929, 937-38 (8th Cir. 1994).  Under federal common law, the attorney-client privilege arises (1) where legal advice of any kind is sought; (2) from a professional legal advisor in his capacity as such; (3) the communications relating to that purpose; (4) made in confidence; (5) by the client; (6) are at his instance permanently protected; (7) from disclosure by himself or by the legal advisor; (8) unless the protection is waived.  *See Williams v. Sprint/United Management Co.*, 2006 WL 266599, *2 (D. Kan. 2006).  The attorney-client privilege could potentially extend to communications between representatives of the client or between the client and a representative of the client, if the communication was made in confidence for the primary purpose of obtaining legal advice. *Williams v. Sprint/United Management Co.*, 2006 WL 266599, *3 (D. Kan. 2006).

In this case, Defendants argue that Dr. Smiley-Marquez was hired as an outside consultant to provide investigative services in the wake of internal complaints filed by Plaintiff Austin and other Denver Water employees.  Under pertinent policies, Denver Water's Human Resources Department was required to conduct an investigation and make preliminary findings if their employees' complaints could not be resolved.  As part of the investigation process, the Human

---

[2]In this case, which invokes the court's federal question jurisdiction, federal common law provides the rule of decision on privilege issues.  *See* Fed. R.Evid. 501.

Resources Department also was expected to consult with the Legal Department before issuing preliminary findings to those employees directly affected. Defendants argue that any communications between the Manager of Human Resources and the Legal Department would be protected by the attorney-client privilege. To the extent that Dr. Smiley-Marques was retained to gather and analyze information that would be utilized by the Manager of Human Resources in her discharging her investigative responsibilities, Defendants suggest that Dr. Smiley-Marquez was the functional equivalent of a Human Resources employee. *See* Defendants' Reply to Plaintiff's Response to Motion to Quash, at 3, citing *In re Bieter Company,* 16 F.3d 929, 938 (8th Cir. 1994) (independent consultant who was involved on a daily basis with company principles, who served as the company's only representative at important meeting with third parties, and who likely possessed information that was not possessed by any other individuals, was the functional equivalent of an employee for attorney-client privilege purposes). As such, Dr. Smiley-Marquez's work would be entitled to the same protections under the attorney-client privilege.

"[T]he attorney-client privilege can attach to reports of third parties made at the request of the attorney or the client where the purpose of the report was to put in usable form information obtained from the client." *Federal Trade Commission v. TRW, Inc.*, 628 F.2d 207, 212 (D.C. Cir. 1980), citing *United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961). However, it may be difficult to identify "those independent outside services performed for an attorney that are discoverable, from those that are not." *Id.* (holding that report compiled by a computer consultant at client's request was not privileged where the court did not have "sufficient facts to state with reasonable certainty that the privilege applies"). The penultimate question is whether the third-party communication was made in confidence for the purpose of obtaining legal advice

from the lawyer. *Id. Compare Carter v. Cornell University*, 173 F.R.D. 92, 94-95 (S.D.N.Y. 1997) (holding that the attorney-client privilege extended to interviews with university employees conducted at the request of counsel and for the exclusive use of counsel in providing legal representation) and *United States Postal Service v. Phelps Dodge Refining Corp.*, 852 F. Supp. 156, 161 (E.D.N.Y. 1994) (outside consultants hired by defendants to conduct environmental studies were not encompassed by the attorney-client privilege where their function was not to put information gained from defendants into usable form for their attorneys to render legal advice, but rather, to collect information not obtainable directly from defendants).

Dr. Smiley-Marquez testified during her deposition that she "was not hired by the [Denver Water] legal department, nor privileged by them." *See* Transcript of Smiley-Marquez Deposition, at 113, attached to Plaintiff's Reply to Defendants' Response to Plaintiff's Motion to Compel. Dr. Smiley-Marquez received no direction from the legal department has to how she should conduct her investigation or what information should be included in her written reports. *Id.* Dr. Smiley-Marquez further stated that she agreed to undertake her investigation only on the condition that she would be completely neutral and free from any interference or influence by the legal and human resources departments. *Id.* at 116-17. Throughout her investigation, Dr. Smiley-Marquez had no confidential communications with human resources or the legal department. *Id.* at 118.

However, it is also clear that Dr. Smiley-Marquez was hired to conduct a factual investigation that would inform the legal guidance given to the Human Resources Department. In light of Ms. Elam-Floyd's deposition testimony, it appears that Dr. Smiley-Marquez was asked to conduct an investigation that would normally be undertaken by the Human Resources

10

Department.  Under the circumstances, the court finds no reason to distinguish between Dr. Smiley-Marquez's investigation and a normal in-house inquiry conducted by Human Resources. Dr. Smiley-Marquez was acting for Denver Water and was gathering information that would be communicated to and utilized by the Legal Department.  *Cf. Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981) (noting that the attorney-client privilege "exists to protect not only the giving of professional advice to those who can act upon it but also the giving of information to the lawyer to enable him to give sound and informed advice").  Based upon the particular circumstances of this case, I find that the materials prepared by Dr. Smiley-Marquez fall within the scope of the attorney-client privilege.

However, the court's analysis does not end with a finding that Dr. Smiley-Marquez's unredacted materials are covered by the attorney-client privilege.  "The attorney-client privilege is not absolute. . . ."  *Ideal Elec. Co. v. Flowserve Corp.*, 230 F.R.D. 603, 610 (D. Nev. 2005).  "It has long been the law that a client may waive protection of the [attorney-client] privilege, either expressly or impliedly."  *IMC Chemicals, Inc. v. Niro, Inc.*, 2000 WL 1466495, *10 (D. Kan. 2000).  Plaintiff's Motion to Compel Production of Documents discusses only in passing the issue of waiver, suggesting that Defendants have waived the attorney-client privilege by asserting the affirmative defense that "Denver Water exercised reasonable care to prevent and promptly correct any unlawful behavior by its employees of which it was made aware."  *See* Plaintiff's Motion to Compel, at 5.  This argument seems to flow from the affirmative defense articulated by the Supreme Court in *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998) and *Faragher v.*

*City of Boca Raton*, 524 U.S. 775, 807 (1998).³  Notably, Plaintiff cites no supporting authority for her claim of waiver.

Defendants responded to this argument in their Reply to Plaintiff's Response to Motion to Quash.  First, Defendants insists that the *Faragher/Ellerth* affirmative defense is not available in this case because Plaintiff has alleged adverse action resulting from an alleged hostile work environment.  In the alternative, Defendants rely upon *Ryall v. Appleton Elec. Co.*, 153 F.R.D. 660, 662 (D. Colo. 1994), which declined to find an implied waiver of the work product doctrine as to notes of interviews conducted by the defendant employer's chief employment counsel.  Defendants' reliance on *Ryall* is hardly persuasive, given that the decision pre-dates *Faragher/Ellerth* and is narrowly limited to materials encompassed by the work product doctrine.

The court's own research has identified cases that address the issue of waiver under similar circumstances.  For example, in *Walker v. County of Contra Costa*, 227 F.R.D. 529 (N.D. Cal. 2005), the plaintiff alleged race discrimination and retaliation under Title VII after twice being passed over for promotion.  When the plaintiff filed a claim with the California Department of Fair Employment and Housing, Contra Costa hired an attorney to investigate the allegations and report to in-house counsel on the merits of Walker's claim.  The County Board subsequently directed the Human Resources Department to prepare a report that was presented to the Board in closed session.  Walker moved to compel production of withheld portions of the reports prepared by outside counsel and the Human Resources Department.  The court in *Walker*

---

³The *Faragher/Ellerth* affirmative defense requires a showing that the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and that the employee reasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or otherwise failed to avoid harm.

12

cited several cases holding that the attorney client privilege and work product protections are waived when an employer asserts the *Faragher/Ellerth* affirmative defense. As the court explained

> If Defendants assert as an affirmative defense the adequacy of their pre-litigation investigations into Walker's claims of discrimination, then they waive the attorney-client privilege and the work product doctrine with respect to documents reflecting that investigation. Where a party puts the adequacy of its pre-litigation investigation into issue by asserting the investigation as a defense, the party must turn over documents related to that investigation, even if they would ordinarily be privilege.

*Id.* at 535. The defendants in *Walker* specifically included as an affirmative defense that "plaintiff's claims are barred because CCCFPD took and had taken reasonable steps to prevent and promptly correct any discrimination and/or harassment in the workplace . . . ." *Id.* Similarly, in the instant case Defendants' sixth affirmative defense asserts that "Denver Water exercised reasonable care to prevent and promptly correct any unlawful behavior by its employees of which it was made aware."[4] The analysis in *Walker* would seem to be equally applicable to the pending motions.

In another Title VII case, *Brownell v. Roadway Package System, Inc.*, 185 F.R.D. 19 (N.D.N.Y. 1999), the defendant employer asserted as a defense to sexual harassment claims that it had "fully and fairly" investigated the former employee's allegations. During discovery, the plaintiff sought discovery of documents generated during a investigation undertaken by outside counsel retained by the defendant employer. The court concluded that the defendant had waived its right to invoke the attorney-client privilege by asserting the adequacy of its investigation as a

---

[4] Notwithstanding the argument advanced in Reply to Plaintiff's Response to Motion to Quash, the court will presume that Defendants had a good faith basis for believing this affirmative defense was supported by the law and facts applicable to the instant case.

defense. *Id.* at 25.

> Where, as here, the employer defends itself by relying upon the reasonableness of its response to the victim's allegations, the adequacy of the employer's investigation becomes critical to the issue of liability. The only way that Plaintiff, or the finder of fact, can determine the reasonableness of Defendant's investigation is through full disclosure of the contents thereof.

*Id. Cf. Equal Opportunity Employment Commission v. Rose Casual Dining, LP*, 2004 WL 231287, * 4 (E.D. Pa. 2004) (holding that plaintiff was entitled to any witness statements "or other documents related to [defendant's] internal investigation" where defendant raised the reasonableness of its internal investigation as an affirmative defense).

In this case, Defendants have taken seemingly inconsistent positions regarding the *Faragher/Ellerth* affirmative defense. On the one hand, Defendants allege that Denver Water "exercised reasonable care to prevent and promptly correct any unlawful behavior by its employees." To substantiate that position, Defendants have provided Plaintiff with a copy of Ms. Elam-Floyd's formal preliminary and final findings on Denver Water's investigation. *See* Defendants' Motion to Quash, at 6-7. This affirmative defense would seem to make Denver Water's investigation of employee complaints, including the unredacted reports prepared by Dr. Smiley-Marquez, both relevant and discoverable. Defendants argue, however, that production of Dr. Smiley-Marquez's unredacted drafts would "reveal the substance and nature of the attorney-client communications that resulted in changes to the preliminary and final reports given to the complainants." *Id.* at 7. Yet those changes may also be relevant in assessing the reasonableness of Denver Water's efforts to "prevent and promptly correct any unlawful behavior." *Cf. Huaman v. American Airlines, Inc.*, 2005 WL 2413189, *3 (E.D.N.Y. 2005) (holding that issues of fact regarding the adequacy of defendant's investigation and corrective measures, and the

14

reasonableness of plaintiffs' actions, preclude summary judgment on the *Faragher/Ellerth* affirmative defense).

In the alternative, Defendants contend that the "*Faragher/Ellerth* affirmative defense . . . is not applicable in this case as it applies only in sexual harassment cases where no tangible adverse employment action is alleged." *See* Defendants' Reply to Plaintiff's Response to Motion to Quash, at 6. Defendants point out that Plaintiff has alleged adverse action resulting from an alleged hostile work environment. I will presume that Defendants were aware of Ms. Austin's allegations at the time they asserted their affirmative defenses. Plaintiff is entitled to conduct discovery based on the defenses asserted in this case and, just as importantly, is entitled to assume that all affirmative defenses have been raised in good faith. As long as Defendants persist in asserting a *Faragher/Ellerth* defense, Plaintiff should be permitted to explore the *bona fides* of that affirmative defense. Any other result would permit Defendants to use the attorney-client privilege as both a sword and a shield. *Cf. American Steamship Owners Mutual Protection and Indemnity Association v. Alcoa Steamship Co., Inc.*, 232 F.R.D. 191, 199 (S.D.N.Y.) (observing that "fairness considerations may also come into play where the party asserting the attorney-client] privilege makes factual assertions, the truthfulness of which may be assessed only by an examination of the privileged communications or documents"), *adhered to in part on reconsideration*, 2005 WL 2254463 (S.D.N.Y. Sept. 15, 2005).

For the foregoing reasons, Plaintiff Austin's Motion to Compel Production of Documents (Document # 50), filed on March 22, 2006, is GRANTED. In view of that ruling, Defendants' Motion to Quash Subpoena Duces Tecum (Document # 42), filed on March 17, 2006, is DENIED.

15

DATED this 19th day of May, 2006.

BY THE COURT:

*s/Craig B. Shaffer*
Craig B. Shaffer
United States Magistrate Judge